IRWIN H. BARD AND MAUREEN L. BARD, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; AVON METAL SERVICES, LTD., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Bard v. Commissioner
Docket Nos. 43131-85, 43174-85
United States Tax Court
T.C. Memo 1990-431; 1990 Tax Ct. Memo LEXIS 452; 60 T.C.M. (CCH) 485; T.C.M. (RIA) 90431; August 13, 1990, Filed *452 Decisions will be entered under Rule 155. Robert E. Meldman and Michael Blumenfeld, for the petitioners. James M. Klein, for the respondent. PARKER, Judge. PARKER
MEMORANDUM FINDING OF FACTS AND OPINION In these consolidated *453 cases respondent determined deficiencies in petitioners' Federal income tax and additions to the tax as follows: Additions to Tax
Docket No.
Petitioners
Years
Deficiencies
Section 6653(a)
43131-85
Irwin H. and
1980
$ 307,280
$ 15,364
Maureen L.
Bard
43174-85
Avon Metal
FYE 04/30/80
190,317  9,516   Services,
FYE 04/30/81
27,180   1,359   Ltd.
Unless otherwise indicated, all section references are to the Internal Revenue Code, as amended and in effect for the taxable years in question, and all Rule references are to the Tax Court Rules of Practice and Procedure. The issues for decision are: 1) Whether petitioner Avon Metal Services, Ltd., accurately reported its cost of goods sold for its fiscal years ending April 30, 1980, and April 30, 1981; 2) Whether petitioners Irwin H. and Maureen L. Bard received constructive dividends from Avon Metal Services, Ltd., in 1980; and 3) Whether any underpayment of tax by either the corporate petitioner or the individual petitioners was due to negligence or intentional disregard of rules and regulations, under section 6653(a). FINDINGS OF FACT Some of the *454 facts have been stipulated and are so found. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Petitioners Irwin H. Bard (Bard) and Maureen L. Bard (Mrs. Bard) are husband and wife, and on the date they filed their petition in this case resided in Milwaukee, Wisconsin. On the date petitioner Avon Metal Services, Ltd. (Avon), filed its petition, it was a Wisconsin corporation with its principal place of business in Milwaukee, Wisconsin. Bard and His Wholly Owned Corporation, Avon Metal Services, Ltd. After spending his undergraduate years at the University of Wisconsin and receiving an L&S (Letters and Science) in political science, Bard entered law school at the University of Wisconsin. Bard attended law school for three and one-half years. He took all of the courses required for the degree, but his grade point average fell just under the level required for graduation. Bard never practiced law, never consulted, and never represented to prospective clients that he was an attorney. [1]
*455 Bard's father-in-law, Myron Gottfried (Gottfried), first introduced him to the buying and selling of precious metals. Gottfried had originally been a jeweler, but started buying scrap gold from jewelers and purchasing the assets of watchmakers and jewelers who were liquidating their businesses. In 1966 Gottfried asked Bard to come to work with him. For the first several years Gottfried taught Bard how to value any and every thing that a jeweler or watchmaker would sell when liquidating the business, e.g., gold scrap, gold rings, dental gold, pocket watches, and watchmaking tools. Bard worked with Gottfried for ten years, until his brother-in-law joined the family business and difficulties between Bard and his brother-in-law led to Bard's departure in April of 1976. Bard incorporated Avon in 1976, and has been its sole shareholder from that time through the years in issue. Avon was operated out of the Bards' home, but it had no physically separate office space in their residence. Bard alone handled all of Avon's buying and selling activities. Mrs. Bard did not know how to purchase and sell precious metals. She had only a rudimentary understanding of some terms of art in the *456 precious metals industry. Her role in Avon's day-to-day business was limited to answering the phone, occasionally going to the post office to pick up packages, addressing packages, and some rudimentary bookkeeping. Since Gottfried carried on his business primarily in Wisconsin, in the early years of Avon's existence, 1976 through 1978, Bard traveled outside of Wisconsin, mainly in Illinois, Iowa, and Indiana, to avoid competing with Gottfried. Having no established business contacts when he incorporated Avon, Bard would simply walk into stores and buy anything he thought he would be able to resell at a profit, e.g., pocket watches, wristwatches, watchmakers' tools, scrap gold, and broken watchbands. Because Bard was generally unknown to these persons at that time, precious metals sellers would only do business with him in cash. That was no longer the situation by the years involved in this case. As time went on Avon's business grew, primarily in its volume of sales of watchmakers' tools and pocket watches. During the years 1976 through 1978 proceeds from the sale of scrap gold and other precious metals comprised less than 50 percent of Avon's gross sales. The profit margin *457 on sales of scrap gold was considerably lower than the profit margin on sales of pocket watches or watchmakers' tools, so Bard concentrated his efforts on buying and selling the latter two items. Bard sold pocket watches to customers all over the United States, and was quite expert in the watch business. In 1979 the price of gold began to rise sharply. By then Bard had made many contacts among watch collectors and dealers through attending conventions of the National Association of Watch and Clock Collectors (NAWCC). The quantity of gold available for purchase at these conventions began to dramatically increase as the market price rose. In June of 1979, for example, Bard attended a NAWCC convention in St. Louis and bought $ 50,000 worth of scrap gold, an unusually large purchase of scrap metal for him at that time. Thereafter, Bard turned his attention away from the rest of Avon's business and concentrated his efforts on buying precious metals -- gold, silver, platinum, and palladium -- in scrap form, e.g., both damaged and undamaged rings, broken jewelry, dental gold, industrial platinum, laboratory platinum, sterling scrap, sterling flatware, industrial silver, plating silver, *458 and palladium industrial scrap. Despite the difference in profit margins between dealing in watches and dealing in precious metals, the increased volume of Avon's precious metals business and the increasing prices for the metals resulted in increased profits. Mechanics of Purchases and Sales -- Estimates of Metal Content
A troy ounce of gold equals 20 pennyweights (DWT) of gold. Karats are roughly equal to 4.17 percentage points of gold content. Thus, a troy ounce of 14-karat gold should theoretically contain roughly 58.38 percent pure gold. However, manufacturers are permitted to work within certain tolerances, so actual gold content varies. Thus, when Bard bought scrap gold, his calculation of the gold content could not be a precise measure but, rather, could only be an estimate based on his experience and expertise. However, Bard's estimates of gold content were unusually accurate. Bard generally used the following measurements in his estimates: 10k = 39 percent 14k = 56 percent Dental = 66 percent 18k = 72 percent 22k = 89 percent
Sterling silver has a silver content of 92.5 percent, while coin silver has a silver content of 90 percent. *459 Mechanics of Purchases and Sales -- Avon's Market, Hedges and Sales
Avon sold most, if not all, of its precious metal purchases to Simmons Refining Company (Simmons Refining or Simmons), a metal refinery in Chicago, Illinois. Unlike many other refineries and other purchasers, Simmons Refining paid for metal purchases only by check and did not deal in cash (currency). Simmons Refining purchased most of its supply at the wholesale level from people who would accumulate relatively large quantities of scrap metals, e.g., dealers, gold buyers, jewelers, and dentists. In addition to selling to major commodity houses, Simmons sold refined metals to local jewelers, solder manufacturers, and electronics firms. When dealing in gold, Simmons Refining normally operated on a two percent profit margin. During the period in which the price of precious metals rose drastically, Simmons' competition for purchases increased. This competition forced Simmons to reduce its profit margin from two percent to .5 percent. The intense competition forced Simmons to increase the percentage of the market price it would pay to dealers. Despite the reduction in its profit margin, however, Simmons' profits *460 were much higher due to the higher volume of purchases and sales. "Locking in," "locking off," and "hedging" are synonymous terms in the scrap metal industry. Before purchasing scrap metals for later resale to Simmons Refining, a dealer would often "lock in" or "lock off" a certain unit price for a certain quantity of metal with Simmons in order to ensure a certain profit on the transaction. At the time the dealer locked off its price with Simmons Refining, Simmons would in turn immediately call a commodities firm and "lock in" or "hedge" a price on the refined content of the scrap metals through a futures contract. Simmons sold gold on a daily basis but only on the London market, not the New York market. Simmons used London's second (afternoon) fix for its pricing. London's second fix was announced at 4:00 p.m. in London which was 9:00 a.m. in Milwaukee. Simmons received information regarding the second fix sometime around 9:20 or 9:30 a.m. on any given day. In order to know how much gold it should sell, Simmons had to know by 9:00 a.m. each day how many ounces of gold would be available for sale. [2]
*461 Simmons sold silver on both the New York and Chicago exchanges. Accordingly, Simmons could hedge silver throughout the day while the exchange was open and trading activity was taking place. Because of the difficulty of determining the content of platinum and palladium in alloy, Simmons would not hedge purchases of these metals unless the scrap was pure. Simmons had longstanding business relationships with several large sellers and felt confident enough in these sellers to hedge purchases of gold, silver, and platinum from them prior to receipt of the metal, based on the sellers' oral representations. For other sellers, however, Simmons hedged purchases and confirmed the price it would pay these sellers only after receipt of their metals. During the periods in issue, Simmons was receiving a large flow of metals from its sellers. Simmons would estimate the precious metal content of the deliveries upon receipt as the scrap was weighed in and inspected. The larger customers generally received advance payment (advances) of a portion of the purchase price when Simmons Refining received the scrap metals. Again, due to the difficulty in estimating the platinum and palladium content *462 in alloy, Simmons did not pay advances for these metals unless the scrap was pure. Later, at settlement when Simmons knew the precise content of the scrap metals received, it would deduct refining charges and interest charges for the advance from the percentage of the purchase price it had not yet paid. Then, Simmons would remit the remainder to the seller. Simmons required other customers to wait for payment until it had refined the scrap and assayed the precious metal yield. By the years in issue Bard had been dealing with Simmons Refining for approximately 15 years. Over these 15 years Bard had not once reneged on a sale of precious metals to Simmons. In fact, no disputes had ever arisen between Bard and Simmons, and Simmons had total confidence in Bard. Because of this established relationship between Bard and Simmons Refining, Simmons would allow Avon to lock off a transaction based on Bard's word alone and before delivery of the scrap metal. With respect to gold, since Simmons Refining had to know by 9:00 a.m. each day how many ounces would be available for future delivery, Bard had to find out from prospective sellers how many ounces of gold they would be selling to *463 Avon. Bard in turn relied on his sellers' oral representations as to the amounts, before he ever saw the metal. Bard's sellers could accept either that day's or the next day's market price, depending on whether or not their calls came in before 9:00 a.m.; or they could gamble and take the price of gold on the date Avon actually received their scrap metal. In this manner Avon generally arranged to sell precious metals to Simmons even though Avon had not yet taken delivery of the metals from the sellers it bought from. In turn, Simmons hedged purchases from Avon in advance of Bard's deliveries. As noted above, Simmons hedged its purchases to protect a two-percent profit margin and was forced to reduce this profit margin to .5 percent as the price of gold rose and competition for the metal increased. Avon in turn generally tried to pay about 90 to 91 percent of the market price for gold it purchased from its sellers. For a brief period in the spring of 1980, approximately from April 3 to June 4, Avon generally reduced its payments to about 84 to 86 percent of the market price for gold. These percentage figures are not particularly meaningful in a rapidly rising market. The prices *464 Avon paid for silver varied anywhere from about 61 to 90 percent of the market price. The record does not establish any particular percentage of market price that it generally paid, and again these percentage figures are not particularly meaningful in a rapidly rising market. [3]
*465 Mechanics of Purchases -- Avon's Purchases and Payment Methods
Bard purchased precious metals for Avon both in person and through the mail. For the in-person purchases, Bard more or less followed a route in the Milwaukee area, visiting various storefront dealers or traveled out of the city through several states. Sometimes a seller would meet Bard at his bank in Milwaukee. For the mail transactions, the seller actually mailed the scrap metal to Bard's home which was Avon's mailing address. When a content standard -- e.g., 10k, 14k, etc. -- was stamped on gold scrap, Bard based Avon's payments on the markings. When the scrap was unmarked, Bard used nitric acid to test its gold content. If he was purchasing the scrap in person, he would test the gold right in the presence of the seller. If he received the scrap through the mail, he would test it in his home upon delivery. Avon advertised in magazines that it would pay cash for its purchases of precious metals. Avon utilized cash to purchase the vast majority of its scrap metal supply. Some 75 to 80 percent of its purchases of scrap metal were cash (currency) transactions. The other 25 to 20 percent of the scrap metal *466 purchases were paid for by check or wire transfer. Avon's other business expenses were paid by check. In that time period, it was customary in the scrap metal industry to deal in cash, particularly with storefront dealers. Avon did business with many dealers who had storefront operations and bought metals from walk-in customers. The storefront dealers needed immediate cash to pay to their customers. Banks sometimes put holds on funds deposited by check, so full payment by check was not acceptable to some dealers. To pay for Avon's purchases, Bard would generally visit M&I Bank and write a check to cash on Avon's account in the approximate amount of the total estimated cash payments that Avon would be mailing that day, plus the total estimated cash payments Bard would be making in person. For mail purchases Bard would wrap an appropriate amount of cash, place it in an envelope, seal it in a box, put a registered number on the box, and mail the box to the seller. Avon also used wire funds transfers to pay for some of its purchases. When Bard bought scrap metals in person in Milwaukee from out-of-town sellers, he would arrange to meet them at the M&I Bank. Purchase transactions *467 took place in the bank's safety deposit room. When Bard bought scrap metals in person from Milwaukee sellers, he would visit the bank first to obtain cash; then he would travel with his scale and some amount of cash to the various sellers' places of business. Bard did not, however, withdraw cash from the bank on a per transaction basis but, instead, on an as-needed basis. The checks to cash were always written in rounded amounts. In a single day Bard would sometimes write several checks to cash in amounts of $ 20,000, $ 30,000, $ 50,000, or other amounts. One cash withdrawal might fund several purchases in some instances. If he had cash left over at the end of the day, Bard might use the leftover cash for the following day's purchases. If he did not redeposit the leftover cash, he sometimes kept it in his safety deposit box at the M&I bank; other times he just kept the leftover money at his home. On the record in this case, it is not possible to correlate the dollar amounts of the checks made out to cash with Avon's purchases of scrap metal. Before January of 1980, Avon generally had no difficulty paying sellers the full purchase price of precious metals in cash close in *468 time to Avon's receipt of the metals. For in-person transactions before January of 1980, Bard generally paid cash at the time he picked up the seller's metals. For purchases by mail before January of 1980, Avon generally remitted payment approximately three or four days after it received a shipment. Avon's cash flow stemmed from its sales to Simmons Refining: when Bard delivered gold, Simmons would generally advance 90 percent of the sale price to Avon. Simmons would issue a check and an invoice to Bard while he was at the refinery. Avon would pay interest on the funds until the settlement date, four weeks from the date of delivery. On the settlement date, Simmons would mail to Avon a check for the balance of the money due on the sale, minus refining charges and interest charges on advances already received. However, that practice changed after December of 1979. In the period from January through April of 1980, Avon often did not pay the full purchase price in cash on receipt of precious metals (in either in-person or mail transactions) because Simmons Refining was no longer advancing to Avon such a large percentage of the purchase price. Simmons reduced its advances as a result *469 of the increase in both the market price of precious metals and the quantity of precious metals available for sale. Simmons did not have enough cash immediately available to continue paying advances at previous levels and in that period reduced its advances to Avon to 50 percent of the sale price of the metals Avon delivered. Moreover, the refinery also increased the delay in settlement from four to eight weeks. At that time Avon informed all of its mail customers (either immediately or when they made their next offer of sale) of the eight-week delay in payment. Accordingly, prior to January of 1980, Avon generally made payment in cash contemporaneously with receipt of the metals for both in-person and mail transactions. However, subsequent to December of 1979 and until about May of 1980, Avon's payment for all mail transactions and some large in-person transactions was delayed to a date several weeks after receipt of the metals. When Simmons increased the delay in settlement from four to eight weeks and reduced its advances to Avon to 50 percent, Avon stopped making any payment at the time of delivery on mail purchases and began remitting the full purchase price later at the *470 time of settlement with Simmons. Thus, Avon apparently was using Simmons' cash advances on mail purchases to fund its in-person purchases. With these delays in payment by both Simmons Refining and Avon, tracing or matching cash to any particular purchase or sale of any particular scrap metal transaction is impossible. The general delay in payment Avon experienced after December 31, 1979, did not have any effect on Avon's smaller, in-person sellers, because Avon had enough cash reserves to pay for $ 200 or $ 500 purchases immediately. Those smaller in-person cash purchases are generally not involved in this case. Avon's Accounting System
Neither of the Bards had much training in accounting. Bard never took any accounting or bookkeeping courses in college and received a "D" in his only accounting course in law school. Mrs. Bard had taken a bookkeeping course in high school. She took some general education courses in college but did not receive a college degree. At the time of trial, Martin Zuckerman (Zuckerman) had been licensed for 25 years by the State of Wisconsin to practice as a certified public accountant and had been working with Avon's books and records for approximately *471 ten years. His knowledge of the scrap precious metals business was limited to what Bard told him. When Bard first organized Avon, he asked Zuckerman for his help in developing a record-keeping system. Through discussions with the Bards, Zuckerman knew that Bard was using cash to make most of Avon's purchases. Zuckerman also knew that Bard was negotiating checks made out to cash to obtain the funds to make the scrap metal purchases. The Bards had set this latter procedure up on their own without any advice from Zuckerman. Zuckerman warned Bard about the substantiation problems (i.e., maintaining a paper trail) involved in transacting business in cash. However, Bard told Zuckerman that survival in the industry required Avon to conduct its business at least partially in cash. Given his understanding of the nature of the industry based solely upon what Bard told him, Zuckerman did not advise Bard to stop using cash to purchase Avon's inventory. However, Zuckerman was under the impression that Avon had records for each purchase detailing the items purchased, the weight, the amount, and the payee. Zuckerman's impression was not correct, at least as to the in-person cash purchases. *472 Avon's Records -- The Phone Logs
The Bards maintained daily records of Avon's incoming and outgoing telephone calls in several phone logs, along with the Bard family's personal phone messages. The phone logs were loose-leaf notebooks with unnumbered pages. [4] The Bards usually kept the phone logs in their kitchen next to the telephone. Avon needed to maintain the phone logs to keep track of the high volume of telephone calls it was receiving from sellers. Without the phone logs Bard would not know how many ounces of metals Avon needed to lock off with Simmons Refining. To determine how much gold Avon needed to hedge, Bard maintained tallies in the phone logs of the amount of gold Avon expected to purchase from sellers. However, the entries in the phone logs as to types and quantities of precious metals were made before Bard ever saw the metals themselves. These entries represent what the prospective seller told Bard over the telephone. *473 While Avon's deliveries to Simmons Refining apparently closely approximated the quantities Bard had locked off with Simmons, the record does not establish the accuracy of the estimated quantities and types of metals in the phone logs. The record does not establish any direct relationship between entries in the phone logs and actual deliveries of scrap metal to either Avon or to Simmons Refining. Bard sometimes entered daily metal trading prices into the phone logs. Bard derived the prices he quoted to Avon's sellers from the prices of gold on the London exchange and silver on the New York exchange. He obtained this price information by phoning Simmons Refining. Based on the price per ounce of gold on the London exchange, Bard would sometimes enter into the phone log the amount he should pay per troy ounce at different content standards, e.g., 10k, 14k, 16k, etc. Bard entered these metal prices in the phone logs so that they would be easily accessible when he needed the information to quote to Avon's customers. An entry in the phone logs reflecting a purchase generally contains the seller's name, the approximate time of the conversation with the seller, the nature of the *474 goods to be purchased, the approximate weight of the goods, and whether Avon had confirmed the price or whether the price would be determined on the date Avon received the goods. As noted above, the entries were made before Bard ever saw the precious metals. Not all entries in the phone logs resulted in actual purchases. Also, some people just called to see what the market price was and/or what Avon was paying. Bard labeled some of the entries with the words "confirmed" or "conf," signifying his understanding that the seller was bound to deliver (and Avon to accept and pay for) scrap metals. There is no evidence that all of the entries labeled as confirmed transactions actually resulted in purchases or that the purchases that occurred were in accordance with the entries in the phone logs. Avon's Records for Mail Transactions -- The Post Office Log
Bard needed to maintain records of the packages Avon received in case the seller questioned the transaction in some manner. Accordingly, Bard kept a post office log listing registered and insured packages by date of receipt, registered or insured number (as appropriate), seller's name, and ZIP code. Avon's Records for Mail *475 Transactions -- Invoices
The Bards also prepared invoices (or sales receipts) for shipments of metals Avon received through the mail. The Bards hand wrote these invoices at the time Avon received and opened the corresponding shipments. [5] These handwritten invoices generally listed the sender, the date of receipt, the registered, express, etc. mailing number, the price of gold on the London exchange, the types and weights of the metals received, the total purchase price for the shipment, mode of payment (i.e., cash, check, or wire transfer), the amount of payment remitted with the invoice, the unpaid balance (if any), and the anticipated period of delay for payment of any unpaid balance (settlement) on an invoice. See n.5, supra. Thus, when a package arrived at Avon, the sender, registered number, and date of receipt were recorded in two different places: in the post office logs and on the invoices. The Bards kept a stack of invoice copies reflecting shipments for which Avon had not yet fully paid. Bard used these copies to keep track of Avon's accounts payable. Avon prepared such invoices for all mail transactions but did not prepare any invoices for in-person transactions. *476 Avon's Records for Mail Transactions -- Mail Purchase Record Books
The Bards also maintained mail purchase record books to record purchases from mail-in customers on an accrual basis. Entries in the mail purchase record books reflected the date, name of seller, and lump-sum dollar amount of each purchase and were copied from the corresponding invoice. Thus, the dates in the mail purchase record books reflected the dates on which Avon received and opened the corresponding shipments, and not the dates on which payments were actually made. While most of the lump-sum dollar amounts entered in the mail purchase record books may have represented cash payments, some portions of these payments were made by check. [6]
*477 Avon's Records for Mail Transactions -- Firm Mailing Books
The Bards maintained firm mailing books to record Avon's outgoing registered, registered C.O.D., and certified mail. Entries in the firm mailing books listed the registered number, the addressee, the address, and any postal fees Avon incurred for sending these packages to mail customers. The firm mailing books did not list the amount of cash and any checks or other items enclosed. [7]
*478 Flowchart of a Typical Mail Transaction
The first evidence of a mail-in transaction would most likely appear in the telephone logs. When a mail-in seller called Avon, the Bards would record the seller's name, the approximate time of the conversation with the seller, the nature of the precious metals to be purchased, the approximate weight of the goods, and whether Avon had confirmed the price or, rather, whether the price would be determined on the date Avon received the goods. Next, when a package containing scrap metals arrived in the mail, the Bards would enter into the post office log the sender's name, the registered, insured, etc. mailing number and the sender's ZIP code on a page headed with the date of receipt. The Bards would then prepare an invoice reflecting the name and address of the sender, the date of receipt, the registered, express, etc. mailing number, the price of gold on the London exchange on the confirmation date, the types and weights of the metals received, the unit price for each type of metal, and the total purchase price for the shipment. The Bards would then copy the total purchase price from the corresponding invoice into the mail purchase record *479 books. The Bards would also indicate on the invoice whether or not cash was enclosed with the invoice, the amount remitted with the invoice, the unpaid balance (if any), and the period of delay for payment of any unpaid balance on an invoice. It is not entirely clear when these latter entries were made on the invoices. See n.5, supra. When Avon mailed the original of the invoice and payment to the sender, Avon would record the registered mail number along with the sender's name and address and the postal charges in the firm mailing book. Records for In-Person Transactions -- Phone Logs and Cash Purchase Logs
In contrast to the relatively thorough documentation the Bards maintained for Avon's mail transactions, [8] *481 the Bards kept little documentation of Avon's in-person transactions. Often the name and phone number of the caller was the only reference in the phone log of any particular in-person transaction. There were no phone calls for many of the in-person purchases. Bard himself more or less followed a route in Milwaukee, visiting various storefront dealers from whom he made cash purchases. He also traveled outside of Milwaukee and outside of Wisconsin to make in-person *480 purchases of precious metals. Other than the phone logs, the only written record for any in-person cash purchase was the cash purchase log. Bard kept cash purchase logs that reflected only the date, name and possibly the address of the seller, and a lump-sum dollar amount for each transaction. [9] Entries in the cash purchase logs did not contain any information regarding the types and weights of metals involved, the unit prices paid for each type, or any other corroborative detail. For example, there was no information as to whether the metal was gold, silver, or some other metal, whether the prices of metal had been confirmed for the London or New York markets, whether there was any unpaid balance on the transactions, and, if so, the anticipated period of delay for settlement of any unpaid balance. Only Bard himself made the entries in the cash purchase logs. There is no evidence in the record to support the lump-sum cash figures in his cash purchase logs. [10]
Questioned Transactions -- Respondent's Coordinated Audit and Its Results
In the early 1980's *482 the Internal Revenue Service (IRS) was auditing several Wisconsin area precious metals dealers simultaneously in an effort to verify receipts and cost of goods sold. The IRS had developed a computer data base of the dates and amounts of alleged purchases and sales of precious metals drawn from the books and records of the various Wisconsin dealers. The IRS used this printout to verify proper reporting of transactions listed on these unrelated taxpayer's books and records. The printout contained numerous discrepancies involving Avon. When revenue agents approached the dealers implicated in these alleged transactions with Avon, the dealers either denied having any involvement with Avon or denied that the transactions could have occurred, or could have occurred in the amounts, as shown on Avon's books. The revenue agents who conducted the audit of Avon focused their attention on Avon's in-person transactions, rather than Avon's transactions by mail, because the IRS audit project covered the Wisconsin area, whereas Avon's mail transactions involved people throughout the United States. [11] The revenue agents were satisfied that Avon had reported all of its gross receipts. Avon apparently *483 sold only to Simmons Refining and Simmons, unlike other refineries and other purchasers at that time, paid for precious metals only by check. The amounts of metals Avon delivered to Simmons and the payments Simmons made to Avon for those metals are well documented. The agents' adjustments and respondent's deficiency determinations resulted from disallowances of some of the figures Avon reported as its cost of goods sold for its fiscal years ending April 30, 1980, and April 30, 1981, in the respective amounts of $ 423,195 and $ 95,033. The specific transactions questioned by respondent are certain alleged in-person cash purchases reflected in Avon's cash purchase logs as follows: FISCAL YEAR ENDED 4/30/80
Name of Seller
Date
Amount
Gary Williams
1/10/80
$  37,326.00 Larry Henk-Heintz
1/16/80
32,974.00 (or Heinz)-Hintz
1/21/80
93,431.60 Michael Malicki/
1/07/80
3,007.00 Gold Emporium
1/28/80
29,850.12 1/29/80
60,393.00 3/06/80
5,325.00 3/31/80
26,151.00 4/17/80
20,473.00 4/30/80
32,873.55 Howard Siegel
1/10/80
15,244.00 Fred Reichert/
1/14/80
8,137.00 Z&M Coins
1/18/80
4,736.00 * 1/18/80
4,197.65 * 1/18/80
11,585.00 1/19/80
1,000.00 2/04/80
9,236.00 3/17/80
1,715.00 3/25/80
8,491.00 4/01/80
3,997.00 4/02/80
1,250.00 4/08/80
5,498.00 4/11/80
** 2,922.00 4/15/80
1,144.00 4/22/80
985.00 4/29/80
1,253.00 $ 423,194.92
*484 FISCAL YEAR ENDED 4/30/81
Name of Seller
Date
Amount
Michael Malicki/
12/30/80
$  4,300.00
Gold Emporium
Fred Reichert/
05/07/80
697.00
Z&M Coins
05/13/80
760.00
05/21/80
939.00
05/27/80
* 348.00
06/03/80
717.00
06/10/80
535.00
06/17/80
1,031.00
06/19/80
762.00
06/24/80
1,214.00
06/27/80
1,518.00
07/01/80
* 934.00
07/08/80
1,656.00
07/10/80
264.00
07/16/80
3,209.00
07/22/80
1,989.00
07/29/80
850.00
08/12/80
2,418.00
08/15/80
662.00
08/19/80
* 4,597.00
08/21/80
* 3,982.00
08/26/80
4,118.00
09/02/80
5,394.00
09/06/80
4,067.00
09/09/80
3,909.00
09/16/80
3,826.00
09/20/80
979.00
09/22/80
3,105.00
10/01/80
8,139.00
10/07/80
* 2,400.00
10/14/80
3,527.00
10/20/80
3,518.00
10/27/80
3,293.00
11/04/80
3,497.00
** 11/11/80
1,406.48
11/17/80
3,137.00
11/24/80
1,249.00
12/02/80
2,815.00
12/17/80
2,289.00
12/31/80
983.00
$ 95,033.48
*485 Questioned Transactions -- Gary Williams and Howard Siegel
During the years in issue Gary Williams, Howard Siegel, and Bob Balzer were scrap metal dealers from the quad cities area of Iowa. Balzer did business as Mississippi Valley Enterprises (MVE). For Sunday, January 6, 1980, Avon's phone logs reflect a 4:40 p.m. telephone call from Gary Williams. The entry indicates that Williams left a phone number for Bard to call after 9:00 a.m. on Monday; that Balzer had 1,000 DWT of metals to sell to Avon; and that Williams had $ 10,000 to $ 12,000 worth of scrap metals to sell to Avon. For Wednesday, January 9, 1980, tallies *486 in Avon's phone logs indicate that Bard considered, among many others, the purchase of a total of 165 ounces of an unidentified scrap metal from "H, B, G", i.e., Siegel, Balzer, and Williams. The total of these various tallies amounted to 366 ounces of metal. Also for Wednesday, January 9, 1980, Avon's phone logs reflect a 6:40 p.m. telephone call from Balzer. The entry indicates that Siegel would be selling "33,000," presumably $ 33,000 of scrap; that Balzer would be selling "17-18," presumably $ 17,000 to $ 18,000 of scrap; and that Williams would call Avon after 7:30 p.m. None of these entries indicate the type and amounts of metal, or indicate a confirmed price or a confirmed transaction. On January 10, 1980, Bard negotiated the following checks made payable "to cash" on Avon's account No. 00270687 at the Marshall & Ilsley (M&I) Bank: Check No.
Amount
2218
$ 40,000
2219
$ 48,000
For January 10, 1980, Avon's cash purchase logs reflect cash payments to Siegel, Balzer and Williams of $ 15,244, $ 12,000, and $ 37,326, respectively. See n.9, supra. These entries do not contain any information regarding the price that Avon had confirmed for the transaction *487 on the London or New York exchange or the types and weights of the metals received. The total of all of the cash purchases reflected in Avon's cash purchase log for January 10, 1980, amounts to $ 82,407. On January 10, 1980, Bard also wrote the following checks on Avon's account No. 00270687 at the M&I Bank: Check No.
Amount
Payee
2220
$ 17,358.00
Siegel
2221
$  5,725.35
MVE
The bank subsequently honored both checks. On January 10, 1980, Avon locked off 200 ounces of pure gold at $ 587.35/ounce with Simmons Refining. Bard delivered the 200 ounces of gold to Simmons Refining on January 15, 1980. The record does not establish that any of those 200 ounces represented scrap gold purchased from Gary Williams or Howard Siegel. Avon has not established that it paid Williams $ 37,326 in cash for scrap metal. Avon has not established that it paid Siegel $ 15,244 in cash for scrap metal. Any scrap metal purchased from Siegel is limited to that paid for by the check in the amount of $ 17,358. Questioned Transactions -- Larry Henk? Hintz? Heintz (or Heinz)?
In the phone logs, there are references to a Larry Henk of Harrisburg, Illinois (phone number *488 618-253-5131) and to a Larry Hintz of Madison, Wisconsin (phone number 608-256-2066). [12] *489 In the cash purchases logs, there are entries reflecting cash purchases from Larry Henk or Larry Hintz or Larry Heintz (or Heinz) of Madison, Wisconsin or from Hintz Enterprises of Madison, Wisconsin. [13]
Larry Henk of Harrisburg, Illinois was a mail-in customer, who sold small quantities of scrap metals to Avon. The transactions with Larry Henk were reflected in the invoices and in the mail purchase record books. Larry Hintz started dealing in precious metals in 1977 in Madison, Wisconsin. In 1979 and early 1980, he had two stores in the Madison area. Hintz sold coins in one store and antiques, jewelry, and stamps in the other. Hintz's telephone number in the Madison area was (608) 256-2066. Hintz never dealt with Avon, never made any telephone calls to Avon, and had never met Bard at anytime before the trial of this case. There is no persuasive evidence that any of the alleged cash purchases from Larry Hintz (or Heintz or Heinz) or Hintz Enterprises of Madison, Wisconsin occurred. [14]
*490 For Wednesday, January 16, 1980, Avon's cash purchase logs reflected a cash payment of $ 32,974 to "Larry Henk" of Madison, Wisconsin. See n.14, supra. These entries did not contain any information regarding the price that Avon had confirmed for the transaction on the London or New York exchange or the types and weights of the metals allegedly purchased. On January 16, 1980, Bard negotiated the following checks made payable to "cash" on Avon's account No. 00270687 at the M&I Bank: Check No.
Amount
2243
$ 60,000
2244
$ 40,000
2245
$ 60,000
There is no persuasive evidence that any of this cash was paid to Larry Henk, Larry Hintz, or Larry Heintz (or Heinz) of Madison, Wisconsin. See n.14, supra. On January 18, 1980, Avon delivered the following quantities of gold to Simmons: Quantity
Gold Content
236 ounces (4720 DWT)
10K
198 ounces (3960 DWT)
14K
43 ounces (860 DWT)
16K
22 ounces (440 DWT)
18K
There is no persuasive evidence that any of this gold was gold purchased from Larry Henk, Larry Hintz, or Larry Heintz (or Heinz) of Madison, Wisconsin. See n.14, supra. For Wednesday, January 16, 1980, Avon's phone *491 logs reflected a 10:00 a.m. phone call from "Larry Henk." The entry indicates that the caller offered to sell to Avon 146 DWT of 10k gold and 120 DWT of 14k gold and that Avon confirmed the price for Thursday, January 17, 1980, on the London market. This was a mail transaction involving Larry Henk of Harrisburg, Illinois, and an invoice in the amount of $ 4,130.68 was prepared. That same day Avon's phone logs also reflect a call at an unidentified time from "Larry -- Madison." The entry indicates the caller's intent to sell $ 100,000 worth of gold (145-150 ounces) if the price were over $ 750/ounce on Thursday. There is no persuasive evidence that such a purchase was ever consummated. See n.14, supra. Bard expected to deliver a rather large quantity of gold to Simmons Refining about that period of time. He feared that he might be the target of a robbery attempt if he personally transported this much gold. Accordingly, he arranged for the services of two off-duty Wauwatosa policemen to accompany him from the point of delivery to Simmons. The two policemen met Bard on January 21, 1980, in the lobby of the M&I Bank in downtown Milwaukee. The three men left the bank lobby *492 and went to the bank's lower level where they entered a room in which people could inspect the contents of their safety deposit boxes and conduct personal business in private. There were three other men already inside the room, and one of them carried a bag of scrap gold and class rings. The policemen were not introduced to the other men, and did not see any cash change hands. At some point, Bard negotiated the following checks written to "cash" on Avon's account No. 00270687 at the M&I Bank: Check No.
Amount
2260
$ 50,000
2261
$ 50,000
Avon's cash purchase logs reflect a payment of $ 93,431.60 on January 21, 1980, to "Larry Henk, Madison, Wis." These entries did not contain any information regarding the price that Avon had confirmed for the transaction on the London or New York exchange or the types and weights of the metals allegedly purchased. As noted above, the Court is not persuaded that any such purchase occurred. The Court is also not persuaded that the transaction involving the two police officers had anything to do with Larry Henk, Larry Hintz, or Larry Heintz (or Heinz) of Madison, Wisconsin. There were several occasions in early 1980 when Bard *493 hired off-duty policemen to accompany him to Simmons. In any event, on this occasion, Bard and the two police officers rode in Bard's car to a car rental agency in downtown Milwaukee. The three men then rented a car and drove to Simmons Refining in Chicago where Bard delivered 249 ounces of pure gold for Avon. Simmons paid Avon a $ 100,000 advance against a $ 202,805.51 net settlement price, computed, in part, by using prices of $ 820.74/ounce for 219.34 of the ounces and $ 713.43/ounce for 29.795 of the ounces. The London market's second fix was $ 750/ounce on Thursday, January 17, 1980, approximately $ 835/ounce on Friday, January 18, 1980, and approximately $ 850/ounce on Monday, January 21, 1980. The record does not establish the particular source or sources of the gold that was delivered to Simmons Refining on January 21, 1980, or on any other date. Based on the above, we find that Avon has not established that it made the purported payment of $ 32,974 on January 16, 1980, or the purported payment of $ 93,431.60 on January 21, 1980, to Larry Henk, Larry Hintz, Larry Heintz (or Heinz), or Hintz Enterprises of Madison, Wisconsin. Avon also has not established that it made *494 those payments to anyone else on those dates or on any other dates. Questioned Transactions -- Fred Reichert (Z&M Coins)
From 1979 through 1981 Fred Reichert did business on the southwest side of Milwaukee as Z&M Coins (Z&M). When Reichert began in business, he purchased silver coins minted before 1965 and sold them to a refiner. Later, with prices rising, Reichert began dealing in precious metals. Late 1979 and early 1980 were especially busy periods for Reichert's scrap metals business. Reichert sold scrap metal to Avon from 1979 through 1981. Reichert often contacted Bard when Reichert was interested in selling scrap metal; however, Bard would periodically just show up at Z&M. Reichert needed cash to run his coin and precious metals businesses, especially during the boom in the market. When he had accumulated some scrap gold and silver and needed more operating cash, he would call Bard who would bring cash to make the purchase. Bard never gave Reichert any invoices, receipts, or other documentation for Avon's cash purchases. No useful purpose would be served by describing in detail Avon's records, or lack thereof, supporting the 51 alleged cash purchases from Z&M *495 that respondent disallowed. The phone logs contain a peppering of entries generally indicating only that Reichert had called and sometimes listing a return phone number. The cash purchase logs contained entries for each transaction consisting of just the date, the name Z&M Coins, and the lump-sum dollar amount of the purported purchase. These entries did not contain any information regarding the price that Avon had confirmed for the transaction on the London or New York exchange or the types and weights of the metals received. There were some Avon checks negotiated to cash and hedge sheets from Simmons Refining dated close in time to the alleged purchases. However, it is impossible to trace or correlate the purported purchases to the funds from each separate check or to identify the particular purchases that comprise each separate hedge. In addition to the 51 alleged cash purchases, respondent also disallowed three purchases from Z&M that had been made by check. Z&M Coins received from Avon two checks, Nos. 2255 and 2257, dated January 18, 1980, written on account No. 00270687 at the M&I Bank in the amounts of $ 4,197.65 and $ 11,585, respectively. Reichert and Wayne Sommerfield, *496 an employee of Z&M, endorsed check No. 2257, while Reichert alone endorsed check No. 2255. Reichert or Z&M Coins did not report these amounts as income. The record, however, does not contain the third check that Z&M supposedly received for an alleged purchase occurring on November 11, 1980. Based on the above, we find that Avon has not substantiated the 51 alleged cash purchases from Z&M (in excess of any amounts already allowed by respondent) or the one alleged purchase by check, dated November 11, 1980. However, Avon has substantiated its payment to Z&M by the two checks totaling $ 15,782.65 for precious metal scrap on or about January 18, 1980. Questioned Transactions -- Michael Malicki/Gold Emporium
Michael Malicki did business as the Gold Emporium. Transactions between Avon and the Gold Emporium generally took place at the Gold Emporium in Wauwatosa, a suburb of Milwaukee. The Gold Emporium sold gold to Avon in the form of class rings, wedding bands, broken chains, dental gold, and other jewelry purchased from customers. Before Bard arrived at the Gold Emporium to purchase scrap, Malicki would presort the gold into different bags containing different qualities of *497 gold. Bard would weigh the bags and determine a purchase price. Until the end of January 1980, Avon generally paid cash to the Gold Emporium at the time Bard picked up the scrap. Again, no useful purpose would be served by describing in detail Avon's records, or lack thereof, supporting the eight alleged cash purchases from the Gold Emporium, listed above. The phone logs contained a number of entries often indicating only that Malicki had called. The cash purchase logs contained entries for each transaction consisting only of the date, the name Gold Emporium, and the lump-sum dollar amount of the purported purchase. The cash purchase log entries did not contain any information regarding the price that Avon had confirmed for the transaction on the London exchange or the content and weight of the gold Avon purchased. As with the Z&M purchases, there are some Avon checks negotiated to cash and hedge sheets from Simmons Refining dated close in time to the alleged purchases. However, again it is impossible to trace or correlate the purported purchases to the funds from each separate check or to identify the particular purchases that comprise each separate hedge. Based on the above, *498 we find that Avon has not substantiated the eight alleged cash purchases from the Gold Emporium. [15]
*499 Constructive Dividends
The Bards received a substantial wage income from Avon which they reported on their individual tax return for 1980. The Bards paid their normal, personal living expenses such as mortgage, utilities, and car payments by check. During 1980 there were no unusual cash expenditures by the Bards personally. There were no lavish expenditures and no indication of any unusual purchases of assets by them that year. The revenue agents auditing the returns of Avon and the Bards found no indication of any diversion of corporate funds to the Bards. Returns and Deficiency Determinations
Zuckerman prepared the petitioner's income tax returns for all of the years in issue. On its corporate income tax returns Avon reported the following: Year
Year
FYE 4/30/80
FYE 4/30/81
Gross Receipts
$ 5,366,990
$ 2,283,159
Cost of Goods Sold
5,040,298
2,084,097
Gross Profit
$   326,692
$   199,062
On their 1980 joint income tax return the Bards reported $ 151,120 in gross income. In the notice of deficiency to Avon, respondent decreased Avon's cost of goods sold for its fiscal years ending April 30, 1980, and April 30, 1981, in *500 the amounts of $ 423,195 and $ 95,033, respectively. Respondent also determined negligence additions against Avon for both years. In the notice of deficiency to the Bards, respondent increased the Bards' gross income by dividends in the amount of $ 518,169 ($ 518,228 - $ 59 dividend received deduction). Respondent also determined that the Bards were liable for a negligence addition. OPINION
Avon, the corporate taxpayer wholly owned by Bard, was in the business of buying and selling scrap metals -- gold, silver, platinum, and others. The issues in this case, substantiation of costs of goods sold, constructive dividends to the Bards, and negligence, are purely factual. I Costs of Goods Sold
The events in this case arose during the period in 1979 and 1980 when there was a rapid and dramatic run-up in the prices of precious metals, particularly gold and silver. The cost-of-goods-sold issue presents essentially a garden-variety substantiation matter, [16] but one made complex by a mountain of documentation in some areas and an astonishing lack of documentation in the critical area of cash purchases, i.e., the vast majority of the costs of goods sold. *501 Avon bears the burden of proving the amount of cost of goods sold. Winer v. Commissioner, 371 F.2d 684, 687 n.5 (1st Cir. 1967), affg. a Memorandum Opinion of this Court; Goldsmith v. Commissioner, 31 T.C. 56, 62 (1958); Rule 142(a). Avon argues that the deficiency notice is arbitrary and unreasonable and that, therefore, respondent should bear the burden of proof. There is no basis for that argument. Moreover, even if respondent had some burden of going forward with the evidence, he has amply done so and the ultimate burden of persuasion rests upon Avon. [17]Borchers v. Commissioner, 95 T.C. (1990). *502 Here there is and can be little dispute as to Avon's gross receipts from its sales of scrap metals. Avon sold virtually all, if not all, of its scrap metal to Simmons Refining. Simmons, unlike many refineries and other purchasers during that period, paid for the metals only by check. The quantities of metals actually delivered to Simmons by Avon and Simmons' payments to Avon for that metal are well documented. Avon reported gross receipts of $ 5,366,990 and $ 2,283,159 for its fiscal years ending April 30, 1980, and April 30, 1981, respectively. Those figures have not been challenged by respondent. Also, Avon paid most of its corporate business expenses by check and those deductions are not in dispute. What is in dispute are the figures for its costs of goods sold. Avon reported on its tax returns for its fiscal years ending April 30, 1980, and April 30, 1981, costs of goods sold in the respective amounts of $ 5,040,298 and $ 2,084,097. Those are the two key figures in determining Avon's proper tax liability. Except for a rough approximation, the record does not permit us to trace and correlate Avon's purchases of scrap metals with its deliveries and sales of such metals *503 to Simmons. Moreover, even if such tracing and correlation were possible, that would merely trace and correlate quantities of scrap metal; it would not supply the critical element as to what Avon paid its suppliers for the scrap metal. During this run-up in the prices of precious metals, many, if not most, dealers in scrap metal were paying cash for gold, silver, and other precious metals. Avon in fact advertised that it paid cash for such scrap metals. About 75 to 80 percent of Avon's purchases of scrap metal were in cash. Thus, the scrap metal industry in general and Avon in particular were dealing in cash with their customers. In that circumstance, there was, as Avon's accountant had warned Bard, a particular need to document, to provide a proper paper trail for those cash purchases. Bard, Avon's sole shareholder, did all of the buying and selling for Avon. Bard dealt extensively in cash and he failed to document those cash purchases. The evidence offered to prove this key element of cash purchases consists of some rather informal and fragmentary records and on Bard's generalized and largely unsupported testimony, which the Court did not find particularly credible. Among *504 Avon's cash purchases, some were better documented than others. As a group, the purchases from mail-in customers were relatively well documented. First, there were the phone logs. Information in the phone logs was fragmentary and far from complete even for the mail transactions. [18] However, for mail transactions, the phone logs were not the only record as to quantities and types of metal purchased and the unit prices and total prices paid for the particular metal. In the mail transactions other records were prepared after the metals had been physically received and examined by Bard. In addition to the post office log recording the receipt of the packages, the Bards actually prepared invoices (or sales receipts) when the packages were opened. The Court regards those invoices as critically important documentation. Those invoices (or sales receipts) listed the sender, date of receipt, mailing number, price of gold (or other metal), and most importantly the types and quantities of metal received, the unit prices, the total purchase price, and the mode of payment (cash, check, or wire transfer). The Bards used copies of those invoices as records of Avon's accounts payable, and then *505 sent the originals of the invoices to the sellers when mailing the check or cash payments back to the sellers. In addition, the Bards recorded purchases from mail-in customers in a mail purchase record book and recorded in the firm mailing books the packages they mailed back to the customer. With all of these various records for mail transactions, however, the critical documentation that provides the real substantiation for the prices paid for the metals is found only in the invoices. *506 Thus, for the mail-in customers, the Bards maintained a reasonably complete paper trail of the cash purchases. Of course there would be an incentive or perhaps even a compelling necessity to document the mail transactions. That is because there would be a seller at the other end of the transaction anxiously awaiting payment for the precious metals he had mailed to Avon. Such a seller would serve as an external force to compel documentation and assure that the payments, whether in cash or by checks or wire transfers, were indeed made. In contrast to the mail transactions where there would be an outside party with an interest in the adequacy and correctness of Avon's records, no such external constraint existed with the in-person cash purchases. Once the seller had received the cash for the scrap metals, the seller would not care whether or not Avon had correct records or indeed any record of the sale. The seller in fact might not want Avon to maintain any record of payments that might be reportable income to the seller. Thus, it becomes particularly important that there be adequate documentation to substantiate in-person cash purchases. Yet here, where the need is greatest, *507 the Bards maintained only the phone logs and the cash purchase logs. No invoices (or sales receipts) were prepared for the in-person cash transactions. At best the phone logs contained fragmentary and incomplete entries as to types and quantities of metals, the unit prices, and total purchase prices. See n.18, supra. Not every entry in the phone logs, even a detailed entry, resulted in a consummated sale. Also, what cannot be lost sight of is that most of the entries in the telephone logs were made before Bard ever saw the particular metals being offered for sale. These entries represented by and large simply what someone told him over the telephone. While the record amply establishes that Bard himself is an expert estimator and that his estimates of precious metal content are unusually accurate, there is nothing in the record to establish the accuracy of any estimates made over the phone by the sellers of scrap metal. In this instance the defects and inadequacies in the phone logs assume greater importance. Significantly, for the in-person cash transactions, no invoices or sales receipts were ever prepared. Other than the phone log entries, the only record was the cash *508 purchase log maintained solely by Bard himself. That cash purchase log listed only a date, a name, and sometimes an address, and a lump-sum dollar amount. There is no evidence to establish the quantities and types of metals purchased in the in-person purchases. There is no evidence to establish the unit prices paid for these unknown quantities of unknown scrap metals. The Court is asked to accept blindly, and without any possibility of substantiation, that these lump-sum dollar amounts Bard wrote in the cash purchase log are true and correct payments for these in-person cash purchases of scrap metal. Bard himself cannot explain what the lump-sum dollar amounts represent for individual transactions. The Court has little confidence in Bard's vague general testimony that these figures are Avon's costs of goods sold in the in-person cash transactions. In fact, for the alleged in-person purchases from Larry Henk, Larry Hintz, or Larry Heintz (or Heinz) of Madison, Wisconsin, the Court is satisfied that those purchases did not occur. The cost of goods sold amounts disallowed by respondent were largely particular in-person cash transactions. In two instances, however, checks were *509 actually written to the seller, and the court has accepted those check amounts as part of Avon's costs of goods sold. As to the remaining in-person cash purchase transactions that were disallowed by respondent, we conclude that Avon has not carried its burden of proof to establish error in respondent's determination. Avon argues that the Avon checks made out to cash (the funds from which were purportedly used in the cash purchases of scrap metals -- both in the mail transactions and the in-person transactions) approximated, on a yearly basis if not on a month-to-month basis, the amounts claimed as costs of goods sold. Assuming that to be the fact, that would not persuade the Court that Avon is entitled to any greater amounts than respondent has already allowed for costs of goods sold. We are aware that the particular in-person cash purchases that were disallowed represent a small portion of the total amount of costs of goods sold and a small number of the total number of purchases. However, that fact does not persuade us that Avon has satisfied its burden of proof as to the disallowed transactions. The scope of the IRS audit project was quite narrowly focused, limited to just the *510 precious metal dealers in the Wisconsin area. That resulted in a very limited computer data base for cross-matching purchases and sales. Respondent allowed the in-person cash transactions where the seller had reported the receipt of the income and allowed all of the mail transactions. Considering the large number of transactions, the vast extent of the dealing in cash, and the lack of documentation of these cash purchases, particularly in the critical area of the in-person cash purchases, the Court is satisfied that respondent has indeed been generous in his allowances of costs of goods sold. The corporate petitioner has not carried its burden of proof, and we sustain respondent's disallowances of costs of goods sold, except for the two checks of $ 4,197.65 and $ 11,585 to Fred Reichert doing business as Z&M Coins. II Constructive Dividends
The next issue is whether or not the individual taxpayers, Mr. and Mrs. Bard, received constructive dividends from Avon. The Court is satisfied that there was a lot of unexplained cash. The Avon checks made out to cash were not in the specific amounts of the particular purchase or purchases that day, but always in rounded numbers. *511 Sometimes several checks made out to cash in rounded numbers would be cashed in a single day. Some of the cash was put in Bard's safety deposit box or retained in his possession. This scenario gives rise to a suspicion or surmise that the Bards were using part of the funds from the Avon checks made out to cash for their personal, family, or living expenses. However, there is nothing more than a faint aroma piscatorial in the record. The Bards received a substantial wage income from Avon which they reported on their tax return. There is no evidence of any unusual or lavish expenditures on their part. There is no indication of any acquisition of additional assets or unexplained increases in the Bards' net worth. Whatever monies Avon had, and it was awash in cash at times, there is no indication that any funds escaped from corporate solution. Accordingly, we hold for the individual petitioners on the constructive dividend issue. III Negligence
Since we find no deficiency in the Bards' individual income tax, there is no underpayment of tax to which any negligence addition attaches. Thus, we hold for the individual taxpayers on the negligence issue. Finally, there *512 is the matter of the addition to tax for negligence or intentional disregard of rules and regulations on the part of the corporate taxpayer. Negligence under section 6653(a) is "lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances." Marcello v. Commissioner, 380 F.2d 499, 506 (5th Cir. 1967), affg. 43 T.C. 168 (1964). Accord Neely v. Commissioner, 85 T.C. 934, 947 (1985).Avon bears the burden of proof on this issue. Bixby v. Commissioner, 58 T.C. 757, 791 (1972). While section 6001 and the regulations thereunder were not determinative as to the substantiation of the disputed cash purchase transactions, they have more relevance here. See n.16, supra. Failure to comply with the requirements of section 6001 constitutes both negligence and disregard of rules and regulations. However, here we are not concerned with Avon's books and records as a whole, but with the *513 records for the in-person cash purchases. Even if the total dollar amount of purchases reflected in the cash purchase logs were the correct figure for Avon's cost of goods sold, without consistent and reliable information regarding the confirmed price and the types, grades, and quantities of the metals purchased, there is no way to verify those figures. No auditor would be able to find or follow a paper trail for Avon's in-person cash purchases. This Court certainly cannot. Avon properly accounted for its mail purchases which it also transacted primarily in cash. There is simply no good reason for Avon's failure to prepare invoices for the in-person purchases or to record in the cash purchase logs the same information found in the mail-transaction invoices. Moreover, Avon's accountant, Zuckerman, discussed the record keeping problems associated with transacting business in cash and believed that records of the information outlined above were being maintained. In failing to follow Zuckerman's advice, Avon exhibited both negligence and intentional disregard of the requirements of section 6001. Here the entire deficiency each year was attributable to an overstatement of the *514 costs of goods sold. This overstatement resulted from the inadequate and essentially nonexistent records so far as the critical item of in-person cash purchases was concerned. Accordingly, we sustain the negligence addition as to Avon. Decisions will be entered under Rule 155. Footnotes
1. Bard has at times given conflicting testimony as to whether he graduated from law school and ever practiced law.↩
2. Oftentimes Simmons would confirm a purchase at a previous day's closing price on the London exchange in order to cover previous sales. These previous sales were not speculative in nature, but instead were the tailend of hedges. Sales tended to be in nice, even numbers and purchases usually did not exactly correspond; purchases at a previous day's closing price generally were small in relation to the amount already hedged and were needed to complete a standard contract amount. Simmons would, however, occasionally "lock off" entire sales first and then buy against the open position.↩
3. At the trial Bard testified that Avon paid 84 percent or 86 percent of the market price for silver, and in answers to interrogatories, he said that Avon paid 80 percent of the market price. Neither of these statements appears to be entirely accurate. The parties have stipulated to the silver prices listed in the phone logs, which have been compared with prices listed on Avon's invoices. For some of the later invoices, Bard calculated the rate↩ by simply multiplying the market price by a certain percentage. The weight listed on the invoice had already been adjusted for the silver content of the particular grade of silver bought, i.e., 92.5 percent for sterling. Thus, Bard would calculate the price Avon would pay by multiplying the weight of the pure silver by the discounted price per ounce. For many of these later invoices Avon paid 80 percent of the market price. For earlier invoices it appears that Bard determined the purchase price using a slightly different method. The rates for silver appearing on these invoices vary with the silver content. In some instances Bard apparently started with the market price, discounted it by his profit margin and then discounted it further by the percentage of silver content in the scrap. He then multiplied this rate by the ounces of scrap received. This method differs from the first method in that instead of adjusting the ounces of scrap received for actual silver content, Bard adjusted the rate per ounce. The profit percentages varied wildly for this earlier period, and the phone logs do not always reflect the day's silver prices. Avon's invoices also suggest a period of time when Avon was not buying silver at all. Thus, while the Court can sometimes determine how much Avon would have paid for silver on a given day, the Court cannot determine that Avon generally paid any particular percentage of the market price for silver.
4. The phone logs were first paginated when reproduced for purposes of discovery and trial preparations in this and related litigation. Other records such as the invoices and the cash purchase logs were also first paginated in connection with such litigation.↩
5. Certain notations on the invoices, e.g., "cash enclosed," "all shipments must be confirmed first," "eight week payment until April," may have been made at the time the invoice was mailed to the seller, rather than when Avon received and opened the package.↩
6. For example, the $ 46,078.64 purchase price to Dave Standt was entered into the mail purchase record book on January 22, 1980, but only $ 23,000 of that amount was later paid in cash. Since all of these entries in the mail purchase record books were made in advance of any actual payments, the Court cannot find that all of these amounts were paid in cash, as Bard testified.↩
7. Avon sometimes returned to the sender items that proved to be something other than gold. Petitioners ask the Court to infer from the amount of any insurance on these packages that that establishes approximately the amount of cash purportedly mailed to these mail customers. The Court is unwilling to make such a leap of faith in the absence of contemporaneous records, particularly when it would have been a relatively simple and easy matter for the Bards to have maintained in their firm mailing books a contemporaneous record of the amount of any cash mailed to these customers.↩
8. Even with the relatively thorough documentation for mail transactions, we note that the only records of the critical items of types and amounts of precious metals and the unit prices paid therefor were the invoices.↩
9. This finding is not to be construed as the Court's acceptance of the accuracy and veracity of any of the individual entries in the cash purchase logs.↩
10. Mrs. Bard went through the cash purchase logs and penciled in totals of Avon's weekly in-person purchases. She then added to this figure the purchases reflected in the mail purchase record books for the same week. The Bards then entered this weekly total of purported cash purchases into a cash payouts journal. The Bards had calculated these "weekly" totals at least in time for Zuckerman to prepare Avon's corporate tax returns for the years in issue. The pencil totals establish that the Bards did not doctor the entries in the cash purchase logs in anticipation of the audit or this litigation. Nonetheless, there is no substantiation for the lump-sum dollar figures in the cash purchase logs, and merely transferring those figures into a cash payouts journal did not provide any substantiation for the accuracy of the original entries.↩
11. While the IRS focused on Avon's in-person transactions, revenue agents examined some of Avon's mail transactions as well, but these went beyond the Wisconsin project and the available data base. No adjustments were made in regard to the mail transactions.↩
*. Bard used checks to pay for these two transactions. Accordingly, these transactions are not reflected in the cash purchase logs.↩
**. The amount reflected here is less than the corresponding amount reported in the cash purchase log, because the seller reported some, but not all, of the payment in income. To the extent that the seller reported receiving the money from Avon, the Service allowed the purchase.↩
*. Some of the amounts reflected here are less than the corresponding amounts reported in the cash purchase logs, because the seller reported some, but not all, of the payment in income. To the extent that the seller reported receiving the money from Avon, the Service allowed the purchase.↩
**. Avon allegedly paid for this transaction by check, but the check is not in evidence.↩
12. These references include the following: 9-12-79 11:34 a.m. Larry Hintz will be at bank at 12:45. 10-11-79 9:35 a.m. Larry Henk Harrisburg 135 DWT 14K Cash 40 10K Confirm for 10/12/79 [Listed in mail purchase record book 10-12-79 -- $ 1,708.16] 10-16-79 Larry Henk Confirm for tomorrow on gold 618-253-5131 81 DWT 14K (he is always light on 186 DWT 10K his weights) to 190 DWT [Listed in mail purchase record book 10-17-79 -- $ 2,078.53] 11-14-79 11:00 Larry Henk 618-253-5131 .999 silver 50 oz. 68 14K 52 10K Please call I quoted him 13.28 on silver & he said that's too low [No evidence that any sale was ever consummated.] 12-03-79 3:50 1-608-256-2066 Larry - Madison Confirm for 12/4/79 250 10K 7.81 160 14K 11.22 70 16K 13.22 95 18K 14.43 8-1/2 22 17.83 1-03-80 Larry Henk 618-253-5131 13.75/oz. prices silver contracts, sterling 10K & 14K 50% silver 1-12-80 Larry of Madison Use Monday market 30 G Call Tuesday night 900 of 10K 700 14K 300 16K 100 18K $ 643 or up 1-608-256-2066 1-16-80 10:00 a.m. Larry Henk 10K 146DWT (Shirley) 14K 120DWT Confirmed 1/17/80 [Invoice for this transaction - $ 4,130.68] 1-16-80 Larry - Madison if over 750/oz on Thursday sell 100 000 (145-150 oz) 1-21-80 10:45 Larry Henk 618-253-5131 until 10:00 p.m. Harrisburg, IL wants to ship some more↩
13. Those alleged cash purchases were: 9-12-79 $ 2,895; 11-06-79 $ 4,637; 12-31-79 $ 10,246; 1-16-80 $ 32,974; and 1-21-80 $ 93,431.60.↩
14. Bard's explanations at trial as to why he did not know and admittedly had never before seen the real Mr. Hintz are not credible. He suggested that he had Hintz mixed up with Larry Henk. However, he knew Henk well enough to enter in the phone log on October 16, 1979, that "he is always light on his weights"; also the phone log on January 16, 1980, purportedly shows calls from both Larry Henk and Larry of Madison that same day. The Court does not believe Bard's suggestion that he was dealing with someone who called himself Larry of Madison or Larry Hintz (or Heintz or Heinz) of Madison. Assuming that the phone calls from someone identifying himself as Larry of Madison, etc. occurred, the Court is not persuaded that the cash purchases entered in the cash purchase logs took place. The Court finds it significant that small purchases from Larry Henk were so well documented, whereas any documentation for these alleged cash purchases from Larry Hintz of Madison (in larger and ever increasingly larger dollar amounts) depends wholly on the lump-sum dollar figures Bard wrote down in the cash purchase logs. See n.13, supra↩.
15. This Court has scrutinized Avon's transactions with Malicki and Gold Emporium, Inc., previously in Malicki v. Commissioner, T.C. Memo. 1988-559, a lawsuit to which none of the petitioners herein were parties. The parties in the present case have stipulated into evidence the entire transcript of the Malicki trial as well as an affidavit and deposition given by Bard in that case. In the Malicki case, the Court concluded that Malicki had not established that he did not receive the payments purportedly made by Avon; here on the record before us we conclude that Avon has not established that it made the payments to Gold Emporium or Malicki. While this may seem anomalous at first glance, the petitioners are different in each case and the record is different in each case. There was no consolidation of the two cases for trial, briefing, and opinion so as to assure a consistent treatment of the same transaction. Moreover, as the Court stated in the Malicki↩ opinion, it did not believe the testimony of either Bard or Malicki. Here, too, the Court did not find Bard to be wholly credible as a witness.
16. On brief the parties refer to cost of goods sold as a deduction subject to section 162. Cost of goods sold is an offset to gross receipts, not a deduction; accordingly, it is not subject to the limitations on deductions contained in section 162. Metra Chem Corp. v. Commissioner, 88 T.C. 654, 661 (1987); Thor Power Tool Co. v. Commissioner, 64 T.C. 154, 163 (1975), affd. on a different issue 563 F.2d 861 (7th Cir. 1977), affd. 439 U.S. 522 (1979).See sec. 1.61-3(a), Income Tax Regs. However, the amount must be substantiated. Also, the parties have partially framed this issue in terms of Avon's compliance with the requirements of section 6001. Section 6001 requires taxpayers to maintain such records of their transactions as the Secretary may prescribe. Section 1.6001-1(a), Income Tax Regs., obligates those "person[s] required to file a return of information with respect to income, * * * [to] keep such permanent books of account or records, including inventories, as are sufficient to establish the amount of gross income * * * required to be shown by such person in any return of such tax or information." Where a taxpayer fails to comply with these requirements, the remedy section 446 provides to the Commissioner is "to reconstruct the taxpayer's income in accordance with a method which clearly reflects the full amount of income received." Petzoldt v. Commissioner, 92 T.C. 661, 686-687 (1989).Accord Mendelson v. Commissioner, 305 F.2d 519, 523 (7th Cir. 1962), affg. a Memorandum Opinion of this Court, cert. denied 371 U.S. 877↩ (1962).Here, however, the Commissioner has simply disallowed the cost of goods sold that Avon reported for several specific in-person transactions. This case thus involves only substantiation. The deficiencies in Avon's records may have a bearing on whether or not it can substantiate those alleged purchases, and on the negligence issue, but this case does not involve reconstruction of Avon's income.
17. As a general rule the trial in this Court is de novo and the Court does not look behind the deficiency notice to examine the evidence, policies, and procedures respondent followed to reach his determination. Petzoldt v. Commissioner, supra, 92 T.C. at 687-688; Greenberg's Express, Inc. v. Commissioner, 62 T.C. 324, 327-329 (1974). We have, however, recognized a limited exception to the general rule in cases involving unreported illegal income. Petzoldt v. Commissioner, supra, 92 T.C. at 688↩.Even then, the remedy is to place the initial burden of going forward on respondent, not to shift the burden of proof. The present case does not fit into this exception, but even if it did, we are satisfied that respondent has come forward with ample evidence to satisfy any burden of going forward.
18. The parties' stipulations as to the contents of the phone logs tend to overdignify these entries. The Court's own examination of the phone logs shows these are little more than some scribbles in a loose-leaf notebook. While some transactions contain the various items of information stipulated to by the parties, much of the information is fragmentary and far from self-explanatory. This defect is not necessarily fatal for the mail transactions since other, and more detailed, records were prepared for those transactions. Also respondent has not challenged the mail transactions since most of them were beyond the geographic scope of the IRS audit project, which was confined to the Wisconsin area.↩